**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 1:15-cr-00395-WSD-RGV-1 |
| | : | |
| LEONARD NATHANIEL | : | |
| PERAGINE, JR. | : | |

**MAGISTRATE JUDGE'S FINAL REPORT,**
**RECOMMENDATION, AND ORDER**

Defendant Leonard Nathaniel Peragine, Jr. ("Peragine"), is charged in a three

count indictment with using a facility and means of interstate commerce to

knowingly attempt to persuade, induce, entice, and coerce an individual who had

not yet attained the age of 18 years to engage in sexual activity, in violation of 18

U.S.C. § 2422(b); knowingly distributing at least one visual depiction of a minor

engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1);

and knowingly possessing at least one visual depiction of a minor engaged in

sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).  [Doc.

14].[1]  Peragine has filed a motion to suppress statements he made following his

arrest, [Doc. 25], and a motion to suppress cell site records, [Doc. 26].   The

_____

[1] The listed document and page numbers in citations to the record in this
Report, Recommendation, and Order refer to the document and page numbers
shown on the Adobe file reader linked to the Court's electronic filing database,
CM/ECF.

government has filed a response opposing the motion to suppress cell site records, [Doc. 30], and following an evidentiary hearing on Peragine's motion to suppress statements,[2] the parties filed post-hearing briefs, see [Docs. 44 & 45].  For the reasons that follow, it is **RECOMMENDED** that Peragine's motions to suppress, [Docs. 25 & 26], be **DENIED**.

## I.  STATEMENT OF FACTS

### A.  The September 25, 2015, Criminal Complaint

On September 25, 2015, Federal Bureau of Investigation ("FBI") Special Agent Kevin Orkin ("Agent Orkin") executed an affidavit in support of a criminal complaint for a warrant to arrest Peragine.  [Doc. 1]; (Tr. at 7-8; Gov. Ex. 1).  In his affidavit in support of the criminal complaint, Agent Orkin explained that on August 18, 2015, an FBI Online Covert Employee ("OCE") of the FBI Child Exploitation Task Force in Atlanta, posted an advertisement on Craigslist entitled "Taboo mom seeking like minded teacher!– w4m – (Atlanta, GA)."[3]  [Doc. 1 at 3 ¶ 4 (internal marks omitted)]; see also (Tr. at 6).  The advertisement specifically stated:

---

[2]  See [Doc. 43] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at __)."  In addition, the government submitted exhibits which will be referred to as "(Gov. Ex. _)."

[3]  Based on his training and experience, Agent Orkin explained that "taboo" was often used in reference to "sexual activity with a child."  [Doc. 1 at 4 ¶ 4].

"Looking for someone with experience in REAL taboo to be a good teacher! Reach out if you know what i'm talking about. A/L/Pic, no experience? Don't bother!!!! No fantasy stuff." [Doc. 1 at 4 ¶ 4 (internal marks omitted)]. The OCE received an email from an individual, later identified as Peragine, which stated: "I know lil something about taboo . . Be a lil more specific . . I a dom daddy and teacher . . I have been in the lifestyle for almost 20 years." [Id. at 4 ¶ 5]. The email communication also included a photo of "an adult male standing in front of a bathroom mirror," who was later identified as Peragine. [Id.].

Agent Orkin then detailed the communications that ensued between the OCE and Peragine through September 18, 2015. [Id. at 4-10 ¶¶ 6-34]. In particular, he relayed that the OCE responded to Peragine's email, asking how old he was and if he had "any age limitations and experience with younger girls." [Id. at 4 ¶ 6]. Peragine responded that he was 32 years old, "d[id] not have a[n] age limit," and he asked for a picture and the conversation was thereafter moved to Kik messenger.[4] [Id.]. The OCE informed Peragine that she was "looking for someone to teach [her] daughter about sex," and Peragine responded that they would need to meet and get to know one another but that he "love[d] to teach and was willing[.]" [Id. at 4-5 ¶

---

[4] Agent Orkin stated that "Kik is an internet-based instant messaging application that allows users to communicate as well as send attachments containing videos or photographs" and that Peragine provided his Kik ID. [Doc. 1 at 4 ¶ 6 & n.2].

7].  The OCE asked Peragine about the ages of those with whom he had experience, and "he stated 14."  [Id. at 5 ¶ 8].  Peragine then asked about the age of the OCE's daughter, and the OCE responded that she was 9 years old.  [Id.].  Peragine proceeded to ask if the OCE had "been prepping her [daughter] in any way," and when the OCE asked what he meant, Peragine responded, "Talk or has she seen . . . What are u wanting to have done[.]"  [Id. at 5 ¶ 9 (footnote and internal marks omitted)].  The OCE stated that she had not, and Peragine indicated that he was "interested."  [Id. at 5 ¶ 10].  Upon being asked again about his prior experience with minors, Peragine stated that approximately 15 years earlier he had "some [experience] as a teen with a niece in the age range," which he described as "[j]ust touching[,] some fingering and mouth play both ways," but he added that he eventually had sex with his niece and that she bled "a lil not to[o] much."  [Id. at 5 ¶ 11 (internal marks omitted)].

On August 19, 2015, the OCE asked Peragine "how [he] came up with his online name 'Lenny Peragine,'" to which he responded that it was his true name and that he "didn't realize his name was displayed."  [Id. at 6 ¶ 12].  After finding out his name had been displayed, Peragine stated that "he didn't for see (sic) something like this happening," and he explained that he meant "Something Not only taboo but illegal[.]"  [Id. (internal marks omitted)].  Peragine proposed a "park play date"

in order to ensure the OCE was not a cop and requested photographs of the OCE's daughter. [Id. at 6 ¶¶ 13, 15]. Agent Orkin explained that in response to Peragine's request, the OCE sent "a photo purportedly of herself and a photo of [a] life like doll which appear[ed] to be an approximately 9 year old female." [Id. at 6 ¶ 15]. Peragine sent a photo of himself in return, [id. at 6 ¶ 16], and he sent an additional photo of himself without a shirt, which displayed numerous tattoos on his arms and chest, [id. at 7 ¶ 18]. Over the course of the conversations with the OCE, Peragine told her that he lived in Lawrenceville and owned a 2006 4x4 midsize truck.[5] [Id. at 6 ¶ 14, 7 ¶ 18]. On September 1, 2015, during a conversation with the OCE, Peragine revealed that he had 3 children, including a 14-year-old son, a 13-year-old daughter, and a 1-year-old daughter, but he said that the two older children did not live with him. [Id. at 7 ¶ 20]. Peragine added that his "son had a gangbang with [him] and a buddy a few months back," which occurred with Peragine's adult female friend while camping. [Id. at 7 ¶ 21].

Agent Orkin reported that Peragine and the OCE had discussed meeting, and Peragine suggested the weekend of September 5, 2015, as his wife would be out of town. [Id. at 7 ¶ 22]. The OCE responded that the time he suggested would not

---

[5] Agent Orkin relayed that Peragine sent a picture to the OCE showing a 2006 Dodge pickup truck, and Georgia Department of Driver Services' records revealed that Peragine owned a 2006 Dodge pickup truck with a Georgia license plate. [Doc. 1 at 7 ¶¶ 18-19].

work, and Peragine stated, "Damn but ok I'm still a lil scared u are a cop . . . b[u]t want to meet[.]"  [Id. at 8 ¶ 22 (internal marks omitted)].  The OCE accused Peragine of being a cop, and he replied that she could see that some of his tattoos show that he had been in prison, and he then revealed that he had committed an armed robbery at the age of 18.  [Id. at 8 ¶ 23].  On September 4, 2015, after being asked by the OCE what she should tell her daughter in advance of the meeting, Peragine advised that she tell her daughter that he was a friend, and he explained that before arranging for his son to have sex with an adult female, he spoke with his son about sex.  [Id. at 8 ¶ 24].  The OCE arranged to meet with Peragine on September 9, 2015, but he cancelled because of personal and work conflicts.  [Id. at 10 ¶ 34].

On September 17, 2015, Peragine used Kik to send an image and four videos of child pornography to the OCE.  [Id. at 8 ¶ 25].  Agent Orkin explained that the "first video sent depict[ed] an adult male penetrating the vagina of an approximately 5-7 year old female who is lying on her back,"[6] that the "second video sent depict[ed] an approximately 8-10 year old female performing oral sex on an adult male," that the "third video sent depict[ed] an approximately 4-6 year old female nude from the waist down, bent over a bed and being penetrated by an adult male," that the "fourth video sent depict[ed] an approximately 5-7 year old female

---

[6] After sending this video, Peragine said, "Hopefully this will work[.]"  [Doc. 1 at 8 ¶ 25 (internal marks omitted)].

in nude in a tub performing oral sex on an adult male who is standing in front of her," and that the "photo sent by Peragine depicted an approximately 6-9 year old female being penetrated anally by an adult male."  [Id. at 8-9 ¶¶ 25-29].

After sending the videos, Peragine asked the OCE to show the videos he sent to her daughter.  [Id. at 9 ¶ 30].  He also expressed his concern numerous times that this was a sting, and he explained to the OCE that he would feel more comfortable if she would send "illegal photos of her daughter," but she did not accede to his request.  [Id. at 9 ¶ 31].  Peragine additionally stated that he would feel more comfortable if he could speak with the OCE's daughter, so on that same day, Peragine spoke with the OCE and a law enforcement officer posing as the daughter on the telephone.  [Id. at 9 ¶¶ 32-33].  During the phone call, Peragine asked the OCE's daughter if she had seen the videos he sent, and she responded that she had, and he asked if she was interested in doing the things she saw in the video, and she said maybe.  [Id. at 9-10 ¶ 33].  The OCE had arranged a meeting for the following day, but Peragine again cancelled, claiming work and personal conflicts.  [Id. at 10 ¶ 34].

Agent Orkin stated in his affidavit that records regarding Peragine's Kik ID revealed that he accessed the Kik application from a "Verizon data device" and a "Comcast internet connection."  [Id. at 10 ¶ 36].  Agent Orkin further indicated that

Comcast records showed that the subscriber for the IP address that Peragine had used was Thomas Johnson and the subscriber's address was 1200 Laurelwood Lane, Lawrenceville, Georgia. [Id. at 10 ¶ 36]. Upon a "drive by wireless network check" at this address, it was discovered that there was an unsecured wireless connection in the vicinity of 1200 Laurelwood Lane, and Agent Orkin averred that the unsecured wireless connection was that of 1200 Laurelwood Lane because of the strength of the signal. [Id. at 10-11 ¶ 38]. Peragine's address, as shown by public records, was 1210 Laurelwood Lane, Lawrenceville, Georgia, which was adjacent to 1200 Laurelwood Lane. [Id. at 10-11 ¶¶ 37-38]. Peragine's license, which was discovered through a Georgia driver's license check, showed a photo that matched the characteristics of the individual in the photos that he had sent to the OCE and listed his address as 1210 Laurelwood Lane, Lawrenceville, Georgia. [Id. at 11 ¶ 40]. A search of Facebook revealed a profile for Peragine, which contained photos of children of approximately 1 and 14 years of age and photos of a camping trip that had been posted to Facebook on August 1, 2015. [Id. at 11 ¶¶ 41-42].

Based on the foregoing, Agent Orkin averred that "there [was] probable cause to believe that on September 17, 2015, [Peragine] knowingly distributed at least one visual depiction of a minor engaging in sexually explicit conduct[.]" [Id. at 12 ¶ 43]. The Honorable Janet F. King, United States Magistrate Judge for the Northern

District of Georgia, signed the criminal complaint and arrest warrant on September 25, 2015.  [Id. at 1]; (Tr. at 7-8).

**B.     The September 29, 2015, Arrest of Peragine**

After Agent Orkin obtained the arrest warrant for Peragine, communications resumed between the OCE and Peragine, and agents delayed executing the arrest warrant because it appeared that Peragine was going to travel and meet with the OCE. (Tr. at 9).  Peragine and the OCE arranged to meet at a McDonald's restaurant in Suwanee, Georgia, on September 29, 2015.  (Tr. at 9, 14, 24).

On September 29, 2015, Agent Orkin, Special Agent Scott Warren ("Agent Warren") of the FBI's Violent Crimes Against Children Squad, a third FBI agent, and an officer with the Gwinnett County Police Department arrived in the McDonald's parking lot approximately 45 minutes prior to Peragine's arrival.[7]  (Tr. at 5, 9, 23, 25). Agents Orkin and Warren positioned their unmarked vehicle at one exit of the McDonald's, while the other FBI agent parked his unmarked vehicle at the other exit.  (Tr. at 24).  The FBI agents were wearing "bullet proof vests that were labeled FBI" and had their weapons, and Agent Warren testified that he believed the Gwinnett County officer had his badge displayed.  (Tr. at 10).  Upon arriving at the McDonald's around 7:00 p.m., Peragine parked in the middle of the parking lot and

---

[7]  Agent Warren testified that "other officers [] arrived shortly after [Peragine was taken into custody] to take care of the vehicle."  (Tr. at 25).

remained in his truck for a couple of minutes.  (Tr. at 9, 24).  Agents Orkin and

Warren moved their vehicle to "the middle of the parking area directly facing

[Peragine's] truck and waited for him to exit the vehicle."  (Tr. at 24).

When Peragine exited his truck, Agents Orkin and Warren "illuminated the

police lights on [their] vehicle, stopped behind his truck, and gave him commands

to get into a position to be placed under arrest."  (Id.).  The agents told Peragine to

"lie on his stomach," at which time he was placed in handcuffs, brought back to a

standing position, and searched incident to arrest.  (Tr. at 10, 26).  Agent Orkin

verbally advised Peragine of his Miranda[8] rights,[9] and Peragine indicated that he

understood his rights and that he "was willing to speak with [them] and answer

questions."  (Tr. at 12-13, 27-28, 33).[10]  Peragine also verbally consented to a search

of his vehicle.  (Tr. at 13, 31).  Peragine spontaneously began making statements

---

[8] See Miranda v. Arizona, 384 U.S. 436 (1966).

[9] Specifically, Agent Orkin advised Peragine that he was under arrest; that he had the right to remain silent; that anything he said could be used against him in a court of law; that if he could not afford an attorney, one would be provided to him; that he did not have to answer questions without an attorney present; and that if he chose to answer any questions, he could stop at any time.  (Tr. at 27-28).  Peragine acknowledged understanding his rights as Agent Orkin was speaking and when he concluded reciting the rights by saying, "Yes, sir."  (Gov. Ex. 2 at 3:10-3:29).

[10] Immediately after his arrest but prior to advising Peragine of his rights, the agents asked him: (1) the location of his pocket knife; (2) whether his pants would fall down if his belt was removed; and (3) whether his name was Leon.  (Gov. Ex. 2 at 0:10-3:09).

about his communication with the OCE after Agent Orkin advised him of his rights at the scene of his arrest, but Agent Orkin interrupted him and said that they would talk when they got to the FBI office. (Gov. Ex. 2 at 3:53-4:05). Agent Warren testified that Peragine "made a lot of requests specific to assisting him with some work-related issues, getting keys for a construction site to people, [and] getting things back to his wife so that she could get some extra money," and that he "also made statements specific to what [they] were investigating[] about . . . how stupid it was that he was there and indicating that he had been the one in communication with the [OCE] and understood why he was being placed under arrest." (Tr. at 10-11); see also (Tr. at 30-31). The agents placed Peragine in the back of Agent Orkin's vehicle to be transported to the FBI office in Atlanta. (Tr. at 14, 31.).

During his transport to the Atlanta FBI office, which took approximately 25 minutes, Peragine made statements about his conversations with the OCE, and he informed Agents Orkin and Warren that he went to the McDonald's to tell her that it was a "bad idea." (Tr. at 14). Agents Orkin and Warren listened to Peragine during the drive to the FBI office but "didn't really engage him in questioning." (Id.). Agent Warren testified that they "just kind of listened to him until [they] got back to [the FBI] office." (Id.). Peragine expressed interest in cooperating with the agents and said, "If I can help y'all in any way, I will." (Gov. Ex. 2 at 25:29-25:31).

Agent Warren replied, "Well, you can tell us about them [the group lists on Kik messenger], I guess, if you want to."  (Id. at 25:31-25:33).  Peragine said, "Well, I mean I'll give you all anything I can.  I really wish it would help me, but I already know that I'm screwed."  (Id. at 25:34-25:39).  Agent Orkin said that any plea bargaining would be left to the attorneys.  (Id.).  Peragine replied, "I understand." (Id. at 26:03).  Agent Orkin told Peragine that they would let the attorneys know how the interview went, and they could go from there.  (Id.).  Peragine later added, "If y'all can, I'm willing to work with y'all.  If y'all can't, I fully understand that too."  (Id. at 27:11-27:16).  The agents' communication with Peragine immediately after his arrest and during his transport to the FBI office was audio recorded.  (Tr. at 11, 13-14); see also (Gov. Ex. 2).[11]

After arriving at the FBI office, Agents Orkin and Warren took Peragine into the booking room, offered him an opportunity to use the restroom, provided him a bottle of water, removed his handcuffs, and placed him in an interview room.  (Tr. at 14-15).  During the interview, Agents Orkin and Warren were seated on the side of the desk closest to the door, while Peragine was seated on the other side of the desk.  (Tr. at 15; Gov. Ex. 3).  Agent Warren testified that he did not believe that

---

[11] The audio recording continued during an interview of Peragine at the FBI office, (Gov. Ex. 2), which was also video recorded, (Gov. Ex. 3).

either he or Agent Orkin had their weapons in the interview room as they generally leave their weapons out of the room for safety purposes.  (Tr. at 15).

Prior to beginning the interview of Peragine, Agents Orkin and Warren asked whether he was under the influence of drugs or alcohol, what his level of education was, and whether he had any problems understanding, and he responded that he was not under the influence, could understand, and could read.  (Tr. at 17-18; Gov. Ex. 3).  Agent Orkin then advised Peragine of his <u>Miranda</u> rights from an FBI Advice of Rights Form, FD-395, by first reading the contents of the form aloud to him and then asking Peragine to read the consent section aloud.  (Tr. at 16-18; Gov. Ex. 4).[12] Peragine signed the waiver portion of the form at approximately 7:52 p.m.,

---

[12] The Advice of Rights form states:

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov. Ex. 4).  The consent portion of the form provides a place for a signature below the following statement: "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (<u>Id.</u>).

acknowledging that he had read his rights, understood them, and that he was willing to answer questions without a lawyer present, (Tr. at 17; Gov. Ex. 4), and Agents Orkin and Warren signed as witnesses, (Tr. at 16).[13]  Peragine proceeded to make certain incriminating statements.  (Tr. at 20; Gov. Ex. 3).

Agent Warren described Peragine's demeanor as "calm[ and] coherent" and explained that he "seemed like he understood everything that [they] were saying to him and asking him."  (Tr. at 18).  He did not have slurred speech and did not appear to be tired or confused.  (Tr. at 20-21).  Peragine never declined to answer a question asked of him, never asked for an attorney, and never asked for the agents to stop questioning him.  (Tr. at 21; Gov. Ex. 3).  The agents did not use any physical force or make any threats or promises to him.  (Tr. at 20; Gov. Ex. 3).  The interview lasted approximately one hour and was video recorded.  (Tr. at 15, 20; Gov. Ex. 3).

## C.   The October 6, 2015, Order for Historical Cell Site Data

On October 6, 2015, the government applied for and obtained an order pursuant to 18 U.S.C. § 2703(c)(1) and (d) authorizing the "disclosure of historical cell site data and related records for . . . [a] Verizon Wireless telephone number ###-###-7297, believed to be used by [Peragine]."  [Doc. 26-1 at 1 (emphasis omitted)].

---

[13] Agent Warren explained at the evidentiary hearing that "the date that the arrest occurred was September 29th, but Agent Orkin inadvertently put the 28th on th[e] [Advice of Rights form]."  (Tr. at 17).

The Order authorized the government to obtain records from Verizon Wireless from the time period beginning on July 1, 2015, through October 1, 2015. [Id. at 2].  The records were to include: names, addresses, local and long distance telephone connection records and call and data records, cell site data, records of times and durations, length and type of service, telephone or instrument numbers, other subscriber numbers or identifies, and billing records.  [Id. at 2-3].

## II.  DISCUSSION

### A.  <u>Motion to Suppress Cell Site Records, [Doc. 26]</u>

Peragine moves to suppress any records obtained from the October 6, 2015, Order for Historical Cell Site Data and Related Records.  [Doc. 26].  Specifically, Peragine maintains that the "production of the records pursuant to the Order constituted a search under the Fourth Amendment of the United States Constitution," and thus "required a showing of probable cause and a search warrant," both of which Peragine contends were absent in this case.  [Id. at 2 ¶ 4].  The government responds that Peragine's motion is due to be denied because his argument is foreclosed by Eleventh Circuit precedent.  [Doc. 30 at 8].

Under the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 et seq., a "governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to

a subscriber to or customer of such service (not including the contents of communications) [] when the governmental entity[] . . . obtains a court order for such disclosure[.]" 18 U.S.C. § 2703(c).  The SCA provides that a court of competent jurisdiction shall issue a court order "only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought[] are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  "While this statutory standard is less than the probable cause standard for a search warrant, the government is still required to obtain a court order and present to a judge specific and articulable facts showing reasonable grounds to believe the records are relevant and material to an ongoing criminal investigation."  United States v. Davis, 785 F.3d 498, 505 (11th Cir. 2015).

Peragine argues that the production of records pursuant to the October 6, 2015, Order violated Peragine's Fourth Amendment rights.  [Doc. 26].  However, the Eleventh Circuit has rejected this argument.  In Davis, the government had obtained an order, pursuant to the SCA, for records from the defendant's cellular telephone provider.  785 F.3d at 502.  The defendant argued that "the government violated his Fourth Amendment rights by obtaining historical cell tower location information from [defendant's cellular provider's] business records without a search warrant

and a showing of probable cause." Id. at 505. The Eleventh Circuit rejected defendant's argument and held that "the government's obtaining of a § 2703(d) court order for production of [defendant's cellular provider's] business records . . . did not constitute a search and did not violate the Fourth Amendment rights of [defendant]." Id. at 513 (footnote omitted). The Eleventh Circuit reasoned that the defendant could "assert neither ownership nor possession of the third-party's business records he sought to suppress" and that he had "no subjective or objective reasonable expectation of privacy in [the cellular provider's] business records showing the cell tower locations that wirelessly connected his calls at or near the time of [the alleged crimes]." Id. at 511. Thus, as Peragine concedes, (Tr. at 35), his argument is foreclosed by binding Eleventh Circuit precedent, and his motion to suppress evidence is due to be denied.[14] See United States v. Wilson, 633 F. App'x

---

[14] In support of his motion to suppress, Peragine cites United States v. Jones, 132 S. Ct. 945 (2012). [Doc. 26 at 3]. The defendant in Davis likewise relied on Jones, but the Eleventh Circuit concluded that "Jones [was] wholly inapplicable." Davis, 785 F.3d at 514. In Jones the Supreme Court found that the government's attaching of a GPS device to a private vehicle and tracking that vehicle for over four weeks constituted a search and violated the Forth Amendment. Id. at 513. The Eleventh Circuit explained that this was not the case in Davis as:

> The government's obtaining [the cellular provider's] records, showing historical cell tower locations, did not involve a physical intrusion on private property or a search at all. The records belonged to a private company, not [defendant]. The records were obtained through a court order authorized by federal statute, not by means of governmental trespass. [The cellular provider], not the government, built and

750, 753 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted) (noting that defendant's argument that "his cell site data was obtained in violation of his Fourth Amendment rights" was foreclosed by <u>Davis</u>).  Accordingly, it is **RECOMMENDED** that Peragine's motion to suppress cell site records, [Doc. 26], be **DENIED**.

**B.**   <u>**Motion to Suppress Statements, [Doc. 25]**</u>

Peragine moves to suppress statements he made following his arrest on September 29, 2015.  [Doc. 25].  Specifically, Peragine argues that his oral waiver at the scene of his arrest was neither knowing nor voluntary, that his subsequent written waiver at the FBI office was tainted by the initial illegality, and that his statements were not voluntary.  [Doc. 44 at 6-15].  The government contends that Peragine's "post-arrest statements to law enforcement were made voluntarily and after a valid *Miranda* waiver."  [Doc. 45 at 1].  The parties do not dispute whether Peragine was in custody at the time he made these statements.  <u>See</u> [Doc. 44; Doc. 45].  Thus, the Court will first address whether Peragine knowingly and voluntarily waived his <u>Miranda</u> rights.

---

controlled the electronic mechanism (the cell towers) and collected its cell tower data for legitimate business purposes.

<u>Id.</u> at 514.  Here, as in <u>Davis</u>, there was no physical intrusion, the records belonged to Verizon Wireless, and the October 6, 2015, Order was obtained pursuant to the SCA.  Thus, Peragine's reliance on <u>Jones</u> is misplaced.

Statements made in response to custodial interrogation are admissible only if the defendant was informed of his Miranda rights and waived them. The government bears the burden of proving by a preponderance of evidence that Peragine validly waived his Miranda rights. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986) (citations omitted). In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 468-70. Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote

omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

A defendant may waive his rights under Miranda if the waiver is made knowingly, intelligently, and voluntarily.  Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted); Edwards v. Arizona, 451 U.S. 477, 482 (1981) (citations omitted); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances."  Patterson, 2007 WL 2331080, at *3 (citation omitted).  However, an express oral or written waiver of

<u>Miranda</u> is strong proof of the validity of the waiver.  <u>United States v. Stephens</u>, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (citation omitted).  To find a waiver involuntary, "coercive police activity is a necessary predicate."  <u>Connelly</u>, 479 U.S. at 167.

Agent Warren testified, and the audio recording confirms, that Agent Orkin verbally advised Peragine that he was under arrest; that he had the right to remain silent; that anything he said could be used against him in a court of law; that he had a right to an attorney; that if he could not afford an attorney, one would be provided to him; that he did not have to answer questions without an attorney present; and that if he chose to answer any questions, he could stop answering at any time.  (Tr. at 12-13, 27-28, 33; Gov. Ex. 2).  Agent Orkin asked him if he understood his rights, and Peragine said he did.  (Tr. at 12-13, 27-28, 33; Gov. Ex. 2).  Peragine proceeded to make certain incriminating statements after Agent Orkin advised him of his rights and during the approximately 25 minute drive to the FBI office.  (Tr. at 10-11, 13-14, 30-31; Gov. Ex. 2).  Once they arrived at the FBI office, Agent Warren testified that Agent Orkin read Peragine his <u>Miranda</u> warnings from an FBI Advice of Rights Form, FD-395.  (Tr. at 16-18; Gov. Ex. 4).  Peragine signed the form, and Agents Orkin and Warren witnessed his signature at 7:52 p.m.  (Tr. at 16-17; Gov. Ex. 4).

### 1.   *Oral Waiver*

Peragine asserts that his oral waiver at the scene of his arrest was neither voluntary nor knowing.  [Doc. 44 at 6-12].  However, the uncontested testimony of Agent Warren at the evidentiary hearing and the audio recording satisfy the government's burden of establishing that Peragine knowingly, voluntarily, and intelligently waived his rights and agreed to speak with the agents.  After being verbally read his Miranda rights and indicating that he understood, Peragine "never invoked his right to remain silent or to an attorney and, by contrast, immediately start[ed] talking about the case." United States v. Hernandez, No. 1:13-cr-183-WSD, 2014 WL 869275, at *13 (N.D. Ga. Mar. 5, 2014), adopted at *4 (citation omitted); (Gov. Ex. 2).  In fact, Peragine informed the agents that he was meeting with the OCE to tell her it was a bad idea,  (Tr. at 14; Gov. Ex. 2), and "[t]here is little that is more quintessentially voluntary than an attempt to talk oneself out of charges," Hernandez, 2014 WL 869275, at *13.

Moreover, to find a waiver involuntary, "coercive police activity is a necessary predicate." Connolly, 479 U.S. at 167.  However, there is no evidence in the record of any unlawful coercion of Peragine on September 29, 2015.  While Agent Warren testified that his gun was drawn during Peragine's arrest, "it was holstered and on [his] person after that."  (Tr. at 10).  And, though Peragine was handcuffed at the

scene of his arrest and during transport to the FBI office, there is no evidence of any physical force or threats being employed against him.  (Id.); see also (Gov. Ex. 2). Agents Orkin and Warren spoke with Peragine in a conversational tone, (Gov. Ex. 2), and Agent Warren testified that the trip to the FBI office was brief, lasting about 25 minutes, (Tr. at 14).  Accordingly, the totality of the circumstances demonstrate that Peragine voluntarily waived his rights.  See United States v. Telcy, 362 F. App'x 83, 86–87 (11th Cir. 2010) (per curiam) (unpublished) (finding voluntary consent where defendant was in handcuffs and in custody because officers did not employ any coercive tactics); Hernandez, 2014 WL 869275, at *13 (noting a defendant's "subject[ion] to ordinary handcuffs and other restraints" during transport "was not something that would overbear the [d]efendant's free will"); United States v. Burston, Criminal Action No. 1:12-CR-180-01-JOF/AJB, 2013 WL 787909, at *11 (N.D. Ga. Jan. 4, 2013), adopted by 2013 WL 787911, at *1 (N.D. Ga. Mar. 1, 2013) (finding the defendant's waiver voluntary where there was no evidence of coercion, deception, or intimidation); United States v. Manson, Criminal Indictment No. 1:11-CR-13-AT-LTW-2, 2012 WL 2861595, at *2 (N.D. Ga. July 11, 2012) (footnote and citation omitted) ("[W]hile the Defendant's interrogation while he was handcuffed and under arrest might have carried some inherent intimidation, the overall

circumstances of the interrogation were not sufficiently coercive as to vitiate the voluntariness of Defendant's statements.").

Agent's Warren's testimony and the audio recording demonstrate that Peragine knowingly and intelligently waived his rights after he was verbally advised of them.  Peragine is an adult who appeared to understand what the agents discussed with him.  (Gov. Ex. 2; Tr. at 13).  Indeed, he stated that he understood, and he did not ask any questions or otherwise indicate that he did not understand his rights.  (Gov. Ex. 2; Tr. at 13).  Agent Warren testified that Peragine was "very compliant and cooperative."  (Tr. at 10).  When asked by the agents during his transport to the FBI office, Peragine stated that he was not under the influence of drugs or alcohol.  (Gov. Ex. 2 at 13:46-14:00).  Peragine assured the agents that he was coherent.  (Id. at 14:01-14:08).  Thus, the record supports finding that he knowingly and intelligently waived his Miranda rights.  See United States v. Harvey, CRIMINAL ACTION NO. 1:15-cr-00053-TWT-RGV-1, 2015 WL 9685908, at *11 (N.D. Ga. Nov. 30, 2015), adopted by 2016 WL 109084, at *1 (N.D. Ga. Jan. 8, 2016).

Peragine argues that the rapidity and timing of Agent Orkin's Miranda warnings prevented him from fully comprehending and voluntarily waiving his rights.  [Doc. 44 at 8-9].  In particular, Peragine contends that the warnings were

"questionable" because he had "just been pulled from the ground where he was handcuffed at gunpoint[ and] Agent Orkin rapidly recited those warnings in less than fourteen seconds." [Id.].  However, as the government argues, while Agent Orkin "recited the standard *Miranda* warnings quickly, the [audio] recording makes clear that he spoke clearly and calmly, and that Peragine clearly said 'yes sir' when asked whether he understood those rights." [Doc. 45 at 15 (citation omitted)]; see also (Gov. Ex. 2).  The record demonstrates that he was advised of his rights in accordance with Miranda and that he understood his rights, (Gov. Ex. 2; Tr. at 12-13, 27-28); see also Mecham v. Smith, No. 1:10-CV-00264-CV-EJL, 2011 WL 3626307, at *10 (D. Idaho Aug. 17, 2011) (noting that while the "*Miranda* warning itself was read to [defendant] quickly," "[n]othing in the [] recording of the interview show[ed] that [he] was not paying attention or that he did not understand the content of the warning"), and Peragine has not presented any evidence to the contrary.  Thus, Peragine's argument is without merit.  See United States v. Pineda-Doval, No. CR-06-00778-PHX-SMM, 2007 WL 2786374, at *1-2 (D. Ariz. Sept. 24, 2007) (finding defendant voluntarily, knowingly, and intelligently waived his Miranda rights, despite his argument that his "rights were read to him in a very quick and perfunctory manner").

Peragine also argues that his waiver was not voluntary as he was presented with a "Hobson's Choice" between remaining silent and ensuring his family's economic needs and his work obligations were met, and that his "concern for his wife's financial predicament served to make the waiver, consent, and cooperation a quid pro quo for law enforcement assistance with his own immediate needs." [Doc. 44 at 9-12]. Peragine asserts that his "consent to speak to agents, as well as his agreement to consent to a search of his vehicle and to provide the swipe code to his phone, were all made at the time he sought agreement from the agents that he would be permitted to advance these interests." [Id. at 9-10]. Peragine points to Agent Warren's testimony that he made "several requests regarding work related and other financial issues" after his arrest. [Id. at 10]. As the government correctly contends, "[a]lthough Peragine may have hoped for, and requested, assistance from the agents with returning certain property to his wife and employer, [the audio recording demonstrates that] the agents never conditioned their assistance on [his] waiving his . . . rights." [Doc. 45 at 17]; see also (Gov. Ex. 2; Tr. at 20). In fact, the audio recording indicates that Peragine was advised of and waived his rights before there was any discussion about his request to return the property in his truck to his wife and employer. (Gov. Ex. 2 at 3:10-3:29). Likewise, Peragine verbally consented to the agents searching his truck after waiving his Miranda rights and before

bringing up any issue about returning the property to this wife and employer.  (Id. 3:45-3:48).  Also, after waiving his rights, Peragine asked the agents to call his wife, volunteering that there was a lock on his phone but that he would show the agents how to get into it, and he subsequently described to Agent Orkin the swipe pattern to unlock his phone.  (Id. at 4:07-5:00).  Thus, Peragine's argument that a *quid pro quo* rendered his waiver involuntary is without merit.  See United States v. Mercer, 541 F.3d 1070, 1075-76 (11th Cir. 2008) (per curiam) (footnote omitted) (affirming district court's finding that defendant's statements to the agent were voluntary as "nothing in the record evidence[d] that anyone made promises to [d]efendant, direct or implied, in exchange for his statements"); see also Burch v. Sec'y, DOC, 535 F. App'x 789, 795 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted).

**2.    *Written Waiver***

Peragine next argues that because his "waiver at the time of his arrest was neither knowing nor voluntary," the "unconstitutional conduct on the part of law enforcement tainted the encounter from its inception" and "warrant[s] suppression of all statements and any fruits of that evidence."  [Doc. 44 at 12].  However, as already discussed, no constitutional violation preceded Peragine's interview.  Accordingly, Peragine's argument in this regard is without merit, and his motion to

suppress his statements during the interview as fruit of an involuntary waiver at the scene of his arrest is due to be denied.

Peragine also appears to challenge his written waiver independent of any taint argument. In particular, he argues that his written waiver was not voluntary due to the coercive environment. [Id. at 12-13]. However, as already discussed, Agent Orkin read Peragine his Miranda warnings from an FBI Advice of Rights Form, FD-395, (Tr. at 16-18; Gov. Exs. 3 & 4), and Peragine signed the form, (Tr. at 17; Gov. Exs. 3 & 4). As at the arrest scene, there is no evidence in the record of any unlawful coercion of Peragine prior to or during the interview on September 29, 2015. The interview was conducted in a room at the FBI office where Peragine was seated at a desk with Agents Orkin and Warren. (Tr. at 15; Gov. Ex. 3). The agents conducted the entire interview in a conversational tone and did not raise their voices or yell at Peragine. See (Gov. Ex. 3). Peragine's handcuffs were removed for the interview and he remained unrestrained through the entire interview. (Id.); see also (Tr. at 15). Agent Warren testified that he did not believe that he or Agent Orkin had their weapons while interviewing Peragine, (Tr. at 15), and a review of the video recording shows that their weapons were not visible during the interview, (Gov. Ex. 3). The agents did not make any threats or promises to induce Peragine to speak against his will, nor did they use physical force. (Tr. at 20; Gov. Ex. 3). Thus, the

28

totality of the circumstances demonstrates that Peragine knowingly and voluntarily waived his rights.  See Telcy, 362 F. App'x at 86-87; Manson, 2012 WL 2861595, at *2.

### 3.   *Voluntariness of statements*

Peragine also asserts that his statements were involuntary.  [Doc. 44 at 13-15]. "Voluntariness of statements is analyzed similarly to voluntariness of the Miranda waiver."  United States v. Bhatt, CIVIL ACTION NO. 1:14-CR-313-AT, 2016 WL 491744, at *2 (N.D. Ga. Feb. 9, 2016).  The United States Supreme Court's holding in Jackson v. Denno, 378 U.S. 368 (1964), governs the voluntariness of confessions, and provides in pertinent part:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

Id. at 376 (citations omitted); see also United States v. Stafford, No. CR208-15, 2009 WL 819377, at *2 (S.D. Ga. Mar. 13, 2009), adopted at *1.  To be voluntary, a confession must be "the product of an essentially free and unconstrained choice." Culombe v. Connecticut, 367 U.S. 568, 602 (1961); see also United States v. Chaidez-Reyes, 996 F. Supp. 2d 1321, 1347 (N.D. Ga. 2014), adopted at 1326 (citation omitted) (quoting United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)).  "A confession is not 'voluntary' pursuant to the Due Process Clause when law enforcement

officials have used coercive conduct."   Stafford, 2009 WL 819377, at *2 (citing Connelly, 479 U.S. at 167).

"Coercion can be mental or physical," and "[t]he test for determining if a confession is the result of coercion requires a review of the 'totality of the circumstances.'"  Id. (citations omitted).  "Among the factors [this Court] must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by the police."  Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) (citations omitted); see also Schneckloth, 412 U.S. at 226. "Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment."  United States v. Thompson, 422 F.3d 1285, 1296 (11th Cir. 2005).  However, "'[a]bsent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law.'"  Id. (alteration in original) (quoting Connelly, 479 U.S. at 164).  "'Indeed, far from being prohibited by the Constitution, admissions . . ., if not coerced, are inherently desirable . . . . [and] [a]bsent some officially coerced [testimony], the Fifth Amendment privilege is not violated by even the most damning admissions.'"  United States v. Sharma, No. 6:09-CR-1-ORL-19GRJ, 2009

30

WL 152868, at *8 (M.D. Fla. Jan. 21, 2009), adopted at *1 (alterations in original) (quoting United States v. Washington, 431 U.S. 181, 187 (1977)).

Under the totality of circumstances in this case, the Court finds that Peragine's statements were not obtained as a result of coercion and were voluntarily made. Peragine's arrest, transport to the FBI office, and interview took less than three hours, which is a reasonable amount of time.  (Gov. Exs. 2 & 3; Tr. at 11); see also Martin v. Wainwright, 770 F.2d 918, 923, 927 (11th Cir. 1985), modified on other grounds, 781 F.2d 185 (11th Cir. 1986) (per curiam) (finding no coercion in spite of 5 hours of interrogation).  There is no evidence that the agents threatened Peragine, or otherwise used physical force during the arrest, transport, or interview.  (Tr. at 20; Gov. Exs. 2 & 3).  While he was handcuffed at the scene of his arrest and during transport to the FBI office, the agents removed the handcuffs at the time of the interview.  (Tr. at 14-15; Gov. Ex. 3).  There is also no evidence that the agents made any promises to obtain Peragine's statements.  (Tr. at 20; Gov. Exs. 2 & 3).  Indeed, the audio recording indicates that Peragine spontaneously began making statements about his communication with the OCE after Agent Orkin advised him of his rights at the scene of his arrest, but Agent Orkin interrupted him and said that they would talk when they got to the FBI office.  (Gov. Ex. 2 at 3:10-4:05).  During the drive to the FBI office, Peragine continued to spontaneously speak to the agents, without the agents having made any promises or threats, and he continued to speak freely with

the agents during the interview at the office after again being advised of his rights. (Gov. Exs. 2 & 3). While Peragine expressed interest in cooperating and Agent Orkin said he would let the attorneys know how the interview went, this exchange did not render Peragine's statements involuntary. See United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985) (citations omitted) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary."); see also United States v. de los Santos, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *8 n.12 (N.D. Ga. Aug. 13, 2007), adopted at *2 (citations omitted) (noting the fact that the agents advised the defendant that her cooperation may be helpful did "not establish coercion undermining the voluntariness of [her] statements"). Finally, Peragine indicated both during transport and at the FBI office that he was not under the influence of drugs or alcohol. (Tr. at 17-18; Gov. Exs. 2 & 3). Thus, all of the factors point in the direction of voluntariness. Accordingly, Peragine's statements, made after arrest and during the interview at the FBI office, were made voluntarily and in conformity with the dictates of Miranda, and it is therefore **RECOMMENDED** that his motion to suppress statements, [Doc. 25], be **DENIED** in its entirety.[15]

_____

[15] Peragine argues that the Court should suppress "all evidence obtained in contravention of the Fifth Amendment and other applicable constitutional protections." [Doc. 44 at 12]; see also [id. at 1). However, he makes no arguments

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Peragine's motions to suppress, [Docs. 25 & 26], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be, and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 6th day of July, 2016.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

pertaining to any other constitutional protections aside from his arguments pertaining to the Fifth Amendment.  See [Doc. 44].  To the extent he is arguing that his Sixth Amendment rights were violated, as the government contends, "for the same reasons [that] the Court [] conclude[s] that Peragine knowingly and voluntarily waived his Fifth Amendment rights by agreeing to speak with the agents after being read his *Miranda* warnings, the Court . . . conclude[s] that Peragine waived his Sixth Amendment right to counsel."  [Doc. 45 at 20]; see also Montejo v. Louisiana, 556 U.S. 778, 786 (2009) (last alteration in original) (citation and internal marks omitted) ("[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in Fifth Amendment[] [a]s . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").